## Kentucky & West Virginia Power Co. et al. v. Brown's Adm'x.

### Oct. 31, 1939.

Arthur T. Bryson, Wm. E. Fannin and Martin & Smith for appellant.

Woods, Stewart & Nickell, John T. Diederich and John Stanley for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

The appellee, the widow and administratrix of J. H. Brown, deceased, brought this action against the appellant, the Kentucky & West Virginia Power Company, Dr. B. F. Wright and the Apex Coal Company, to recover damages growing out of the death of her husband by electrocution, under claim that it was caused by the joint and concurring negligence of the defendants.

The defendant, Apex Coal Company, was eliminated

from the case at the close of plaintiff's testimony and the trial proceeded thereafter against the co-defendants, Kentucky & West Virginia Power Company and Dr. B. F. Wright.

Upon submission of the case to the jury, it returned a verdict in favor of the plaintiff in the sum of $2,000 against the Kentucky & West Virginia Power Company and found for the co-defendant, Dr. B. F. Wright, holding him blameless.

Judgment was accordingly so entered.

This appeal is prosecuted by the Kentucky & West Virginia Power Company, to which we will hereinafter refer to as the power company, asking its reversal upon the grounds: (1) That the trial court should have given the jury a peremptory instruction to find for the defendant power company, for the reasons assigned, (a) that the defendant power company owed no duty to plaintiff's decedent which it had violated and (b) that plaintiff's decedent, J. H. Brown, was guilty of contributory negligence; and (2) that the trial court erroneously admitted incompetent evidence, which was highly prejudicial to the appellant power company.

The facts and circumstances surrounding the occurrence of this fatal accident, out of which this action arose, are, as disclosed by the record, that on March 5, 1935, the decedent, J. H. Brown, together with his son, Ray Brown, met Howard Williams, an associate in their business of buying scrap iron and junk, when he stated he thought they could purchase a quantity of junk at the old Apex mine; that the three of them then drove to Seco, near the mine, to see the defendant, Dr. B. F. Wright, who they were informed had bought the mine scrap, and inquired of him if it were for sale.

Dr. Wright told them, it is testified, that he hardly knew what scrap iron he had at the mine and had no time to then talk with them about it. Ray Brown testifies that Dr. Wright told his father, J. H. Brown, to go look it over and come back. The latter statement Dr. Wright denies making, in which he is corroborated by Williams. Thereupon the three went directly to the Apex mine to make an examination of its reported junk.

The proof shows that the Apex Coal Company's mine is located on the branch of the Kentucky River in Letcher county and that about 1923 it decided to operate

the mine with electric power; that it contracted therefor with the appellant, Kentucky & West Virginia Power Company, and that, in order to do so, it erected a bank of transformers and a substation on a somewhat isolated place within its hundred acre fence-enclosed boundary, on the mountainside, about a thousand feet from the county road; that a feed line from the power company's transmission line was run from near the county road over three wires, each carrying current of 6,600 volts to the top of what was known as the "dead end" pole, where the power was delivered to the coal company. Further provision was here made by the coal company for the renewal of fuses and the operation of "cut-out" switches, by the erection there of a platform about six feet from the ground. Leading up to this platform, on the date of the accident, there was a small ladder.

From the "cut-out" switches, three wires led down on the inside of the platform to the transformer. Also, there was a sign posted at the end of the platform, in plain view of anyone approaching this enclosure, on which was printed "Danger—2200 Volts—Keep Out."

At the top of the "dead end" pole, at which point the coal company received its electric current from the lines of the power company, the latter's lines, equipment and control thereover terminated. From this point on the "dead end" pole, the lines down to the "cut-out" switches, the switches themselves, the transformer and distributing line, installed at the place where the accident occurred, were owned and controlled by the Apex Coal Company and its successors. The power company had no control over or property interest in the wires or distribution of the current beyond the top of the "dead end" pole, some eighteen feet above the ground.

In 1933, or some ten years after the coal company's installation of the appellant's electric power at its mine, the coal company encountered financial troubles, went into receivership, closed down its mine and made public sale of all its electrical and mining equipment.

The co-defendant, Dr. Wright, became, at its auction sale, the purchaser of it. Thereafter, Mr. T. F. Brooks, the former manager and later receiver of the mine, having continued to occupy a house within the mine enclosure, contracted with the power company to continue furnishing him with electricity at his house, for his and several neighbors' domestic use.

To this end the company, who had no equipment over which to supply Brooks with electricity, extending beyond this dead end pole, installed a meter and a transformer on a pole located by his residence and proceeded to there deliver him current through the wires and equipment of the old defunct coal company, without getting permission therefor from its owners or making any inspection with respect to the condition and safety for its transmission through the old company wires, before making use of it for furnishing electricity to Brooks.

About two years after the power company's thus appropriating the old mine's electrical equipment and wires, during which time they had fallen into a bad and unsafe condition and the mining plant had grown up in grass and weeds and was covered with scattered junk, the decedent and his associates, on March 5, 1935, made an inspection visit to the mine for the purpose stated of examining this abandoned junk and purchasing it.

The proof tends to show that as they were completing their examination of the mine and were on their way out, Ray Brown had a call of nature and stepped aside to answer it, while his father and Williams waited for him. Being then near the bank of transformers, Mr. Brown walked over to where he saw the ladder leaning against the platform and climbed up it to the platform by the transformer when he then asked Williams whether there was any "juice" in those wires, to which Williams answered that he didn't know. Brown then reached out and took hold of two wires, with the result that he was thereby shocked and almost instantly electrocuted.

This suit was brought to recover damages for his death, under the claim that it was caused by the appellant's negligence, as stated supra.

From the verdict and judgment thereon, awarding damages of $2,000 against appellant in favor of appellee, appellant seeks its reversal upon the grounds stated above.

In view of our conclusion reached, that the judgment will have to be reversed because of the trial court's error in refusing to sustain appellant's motion for a peremptory instruction, we deem it unnecessary to discuss or express any opinion as to appellant's other assignments of error.

To the allegation made in the petition, that Brown's death was caused by appellant's negligence, appellant answered, denying the allegation and affirmatively pleaded the contributory negligence of the decedent as the proximate cause of his death.

The proof introduced upon the trial on this issue was that the decedent went, as stated supra, upon the platform located by the transformers, amidst the electric wiring hanging down about it, when, while manifesting his doubt and suspicion as to the safety of his surroundings by inquiring of Williams if there was any "juice" in the wires and receiving his answer that he did not know, Brown nevertheless reached out and grabbed a wire in each hand, by which he received so severe an electrical shock as to instantly kill him.

It is appellee's contention that due to the special circumstances under which the decedent acted in taking hold of the wires, his conduct did not in itself conclusively show a failure to exercise ordinary care for his own safety, when neither he nor his friend, Williams, knew nor could have suspected that the wires he took hold of were not safe and free of deadly current.

Appellee claims that in view of the abandoned appearance of the mine and knowing that it was a defunct operation and that its electrical wiring had not been used for supplying operating current, decedent had the right to interpret the appearance of things as reasonably showing there was no current then in the wires.

The appellant, on the other hand, contends that decedent's conduct could not be so regarded, as being of such uncertain character as presented a question for the jury as to whether his act was "contributory negligence," for the reason that his question asked Williams just before he caught hold of the wires conclusively showed that he, at the time, was in doubt as to whether or not there was current in the wires, and that his conduct in taking hold of them, under such circumstances, conclusively showed him guilty of such contributory negligence, causing his death, as required the court's giving, as a matter of law, the peremptory instruction requested by appellant.

Appellant further contends that even conceding, arguendo, that appellant's conduct, in turning on its dangerous high voltage current into the wiring and

equipment of the defunct mine, without making previous examination of it to determine its fitness and safety for such use, constituted actionable negligence, the appellee, notwithstanding the power company's negligence, is precluded from recovery of damages because of the decedent's own contributory negligence in catching hold of the wires under the circumstances stated, which proximately caused his death.

Appellee contends that the appearance of the closed and shut down mine, making it obvious that it was no longer nor had been for a long while in operation, made questionable the character of the decedent's conduct in catching hold of the wire, in that he was reasonably justified, under such conditions, in believing there was no danger in the old wires hanging about the transformer or that they contained a dangerous current, and that therefore the question as to whether or not, under the circumstances stated, he was guilty of contributory negligence in taking hold of the wires was one for the jury's determination.

In support of such contention, appellee cites the old and leading case of Lewis' Adm'r v. Bowling Green Gaslight Company, 135 Ky. 611, 117 S. W. 278, 279, 22 L. R. A., N. S., 1169, wherein the facts were very similar to those here presented.

There the facts were that the appellee furnished electric power for a private electric light line extending beyond the city limits of Bowling Green, to supply some suburban residents with lights for their dwellings. One of the wires got down and parted in two places. It hung from the poles and partly on a fence or a tree, so that it was sagging some six or eight feet above the ground and alongside of the highway in front of I. O. Lewis' residence. The insulation was worn off the wire in many places and it had not been inspected by the company since it had been put up or for about two years.

While walking along the highway, Mr. Lewis saw this loose wire and stepped over and took hold of it, probably to pull it down, when he was shocked and killed by the current of electricity in it. What his purpose was, when taking hold of the wire, did not appear, because the trial judge erroneously refused to allow the witness to state what Lewis said as he took hold of the wire. In such particular that case is to be distinguished from the instant one, where what the decedent said as

he here took hold of the wires was allowed to be told by the witness, Williams.

That suit, as here, was brought by the personal representative of decedent to recover for his death, on the ground that the light company was negligent in not looking after the insulation and safety of the wire, and in turning into it such a dangerous voltage of electricity without knowing that the wire was in fit and safe condition along the highway where people might be expected to come in contact with it.

The court there held that under the facts stated, the case was one for the jury both as to the company's negligence and the decedent's contributory negligence; that the company could not escape its responsibility as a dispenser through the public streets and roads of such a stealthy, deadly force as an electric current of such high voltage upon insecure lines of wire, where the public might reasonably be expected; and that when it used its lines, it was its duty to see to their safe and proper condition. Further, as to the light company's plea of Lewis' contributory negligence, it stated that the applicable rule in such case was that:

"Ordinarily, when the facts are admitted, and where there is no conflict in the evidence, it is a question of law whether they constitute contributory negligence; but it is not always so. Although the facts may be admitted, still, if it be a question whether the act of the plaintiff at the time was such as an ordinarily prudent person would have done under the same circumstances, the jury ought to be permitted to say whether, under the circumstances, it was or was not negligence, but for which the defendant's negligence would have been harmless. If the act relied on is admitted and is clearly negligent, or is clearly not negligent, the court as a matter of law should by instructions to the jury dispose of the matter; but, although the proof is all one way as to the act, the act itself may be of such doubtful character as to render it an issue of fact, as much so as if the act itself were not of a doubtful character, but the evidence tending to establish or to disprove it was. If the decedent knew that was a live wire, and knew the danger of touching it as he did, the act would be undoubtedly negligence on his part which would defeat a recovery for his injury. If

he did not know, and had not reason to believe, it was a live wire, but, on the contrary, had reason to believe the electric current was not turned onto it, his was not such an act as an ordinarily prudent person might (not) have done under the same circumstances.'' (Parenthesis ours.)

We approve the soundness of principle and reason supporting this ruling and would be inclined to here adopt and apply it, were it not for the presence here of an additional fact, which serves to distinguish the instant case from the Lewis case, supra.

Here, as stated above, the character of the decedent's act in taking hold of the wire, under the circumstances stated, was not left to our conclusion to be drawn solely from his conduct, as to whether or not it showed him guilty of contributory negligence, but we further have his question asked of his companion, Williams, at the time of his taking hold of the wire, as to whether there was any ''juice'' in it, to which inquiry Williams, showing his own doubt as to this, answered that he did not know.

Clearly, this statement, which accompanies the decedent's act, was admissible as a part of the res gestæ and in itself showed that decedent, when in such a state of doubt, as to the dangerous condition of the wire, did not exercise ordinary care for his own safety in taking hold of it.

We therefore conclude, under the special circumstances found in this case, that the decedent, both by his rash conduct and his statement made in connection with his rash conduct, conclusively showed himself guilty of such contributory negligence as not only warranted, but required, the trial court's sustaining appellant's motion for a peremptory instruction. From this it follows that because of the court's error in refusing the giving of this instruction, its judgment must be and it is reversed.